## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MININNO LAW OFFICE
John R. Mininno, Esq. (JRM 7223)
475 White Horse Pike
Collingswood, New Jersey 08107
Tel. No. (856) 833-0600
Fax. No. (856) 833-9649
Attorney for Relator, Diana Karume

|  |  |
|---|---|
| UNITED STATES OF AMERICA and the State of NEW JERSEY, *ex rel*., DIANA KARUME, | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730 and Local Rule 5.3** |
| Plaintiffs and Relator, |  |
| v. | Civil Action No.: _____ |
| ROSE MOUNTAIN CARE CENTER, INC., ESTHER ROSENBERG, JONATHAN ROSENBERG, TIGI KANU, AXA KIEFFER, WILFRIEDA KANU, MAGGY LAWRENCE, DELIGHT CARE HOME HEALTH AGENCY, INC., MARINA SONTF, and DR. VALLUR S. THIRUMAVALAVAN, | **FALSE CLAIMS ACT COMPLAINT JURY TRIAL DEMAND** |
| Defendants. |  |

## <u>INTRODUCTION</u>

1.    Plaintiff, Diana Karume (the "Relator") brings this *qui tam* on behalf of United States of America ("USA"), State of New Jersey ("the State") (the USA and the State are sometimes referred to as "the Government") pursuant to the provisions of the Federal False Claims Act, 31 U.S.C. § 3729-3733 and the False Claims Acts of the States against defendants Rose Mountain Care Center, Inc. ("RMCC") Esther Rosenberg, Jonathan Rosenberg, Tigi Kanu, Axa Kieffer, Wilfrieda Kanu, Maggy Lawrence, Delight Care Home Health Agency, Inc., and

Marina Sontf, Dr. Vallur S. Thirumavalavan, ("the Defendants") to recover damages and civil penalties from the Defendants made or presented to the USA and State.

2.      These violations arise out of Defendants' knowing submission of false and fraudulent claims to the Government for healthcare services that were either not rendered, unlawfully rendered, not authorized or were otherwise not lawfully authorized to be reimbursed by the Government as is detailed below.

## FEDERAL JURISDICTION AND VENUE

3.      This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.  This Court has supplemental jurisdiction over the counts relating to the state False Claims Acts pursuant to 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, resides, or transacts business in this District. Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District.  31 U.S.C. § 3732(a).

5.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

## PROCEDURAL ALLEGATIONS

6.      To the extent, if any, that this case is deemed to be a "related action" and to the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of the filing of this action, as set forth in 31 U.S.C. § 3730(e), said factual allegations in common with any pending action that would cause this case

to be a "related action" are hereby expressly excluded from this action, but only to the limited extent necessary to avoid the statutory preemption.

7.      Furthermore, to the extent that the allegations or transactions set forth herein are the subject of civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein, which are the subject of any such civil suit or administrative civil penalty proceedings are expressly excluded, but only for the specific time periods, specific companies, and/or specific allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding.

## PARTIES

### RELATOR, DIANA KARUME, LPN

8.      At all times relevant and material hereto, Relator, Diana Karume, residing in the City of New Brunswick, County of Middlesex, is and was a licensed practical nurse in the State of New Jersey and employed by Defendant RMCC as a nurse in Defendant's office in New Brunswick, New Jersey.  Relator began her employment with the Defendant RMCC on a full time basis in May 2011.

9.      Relator, Diana Karume is a former employee of Defendant Delight Delight Care Home Health Agency, Inc. and a former student at Delight Care Home Health Training Program

10.     To the best of Realtors' knowledge, Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

11.     Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

12.     Relator brings this action based on her direct knowledge and, where indicated, on information and belief.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4)

### DEFENDANTS, DELIGHT CARE HOME HEALTH AGENCY, DELIGHT CARE HOME HEALTH TRAINING PROGRAM AND MARINA SONTF

13.     Defendant, Delight Care Home Health Agency and Delight Care Home Health Training Program, combined known as "Delight Care", is a for profit entity located in Edison, New Jersey. Defendant purports to provide home health care training and preparation for students to become licensed home health aides in the State of New Jersey.

14.     Defendant Marina Sontf, a nurse of Russian decent, is the principal of both the Delight Care Home Health Agency and the Delight Care Home Health Training Program.

15.     Delight Care is licensed through the New Jersey Division of Consumer Affairs. Delight Care holds a license as an HHA Employer (License Number HP0059900) and previously held an HHA Program Approval License (License Number 2005-0198) which expired at the end of 2010.

### DEFENDANTS, ROSE MOUNTAIN CARE CENTER, INC., JONATHAN ROSENBERG, ESTHER ROSENBERG, TIGI KANU, AXA KIEFFER, MAGGY LAWRENCE, WILFREDA KANU AND DR. VALLUR S. THIRUMAVALAVAN

16.     Defendant, Rose Mountain Care Center, Inc. ("RMCC") is a New Jersey for profit nursing home, founded in 1967.  RMCC is a single location which is located at 27 US Highway 1, New Brunswick, New Jersey 08901.

17.     RMCC provides long term care services for residents in New Jersey.

18.     At all times relevant herein, Defendant RMCC acted through its agents, employees and principals and the acts of the Defendant's agents, employee and principals were within the scope of their agency and employment.  The policies and practices alleged in this complaint were, on information and belief, set or ratified at the highest corporate levels of the Defendant and are employed at all branches of the Defendant.

19.     Jonathan Rosenberg is the Co-Owner and President of RMCC. Esther Roseberg is also a Co-Owner. Tigi Kanu is the Director of Nursing at RMCC while Axa Kieffer serves as the Assistant Director of Nursing

20.     RMCC is divided into essentially two wings.

21.     The West Wing consists of primarily Chinese-American patients and the unit manager is Maggy Lawrence, RN.  Most of these patients speak Chinese as a first language and many do not speak any English

22.     . There are approximately 57 patients in the West Wing.

23.     The East Wing is predominately non-Chinese.  The unit manager for the East Wing is Wilfreda Kanu, LPN.

24.     East Wing patients typically come from a much lower socio-economic environment and they have little or no family members and rarely have visitors.  Some of the patients in the East Wing have also been former drug abusers.

25.     These patients are fed very poorly, often times canned food and this wing is also far dirtier than the West Wing. Bed sores and urinary tract infections are prevalent in patients in the wing, signifying neglect.

26.     There are approximately 43 patients in the East Wing.

27.     On any given shift, the Relator would be assigned to work either the East Wing or the West Wing.

28.     Defendant, Dr. Vallur S. Thirumavalavan's private practice and primary office are located in Somerset, New Jersey and he is also listed as a Robert Wood Johnson physician. He is a specialist in General Internal Medicine, and he maintains an office at the UMDNJ-RWJ Medical School, in New Brunswick, New Jersey.  Dr. Thirumavalavan is the physician assigned to about 19 patients in the East Wing and upon information and belief, he attends to a significant number of patients in the West Wing as well.

## STATUTORY AND REGULATORY BACKGROUND

29.     Medicaid is a federal health insurance system that is administered by the states and is available to low-income individuals and families who meet eligibility requirements determined by federal and state law (herein referred to as "Medicaid beneficiaries" or "Medicaid recipients").  Medicaid pays for items and services, including long term care/nursing home health  pursuant to plans developed by the states and approved by the Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS").  42 U.S.C. §§ 1396a(a)-(b).  States pay health care providers, including nursing homes, according to established rates, and the federal government then pays a statutorily established share of "the total amount expended … as medical assistance under the State plan."  See 42 U.S.C. §§ 1396b(a)(1).

30.     States electing to participate in the Medicaid program had to comply with the requirements imposed by the Social Security Act and regulations of the secretary of the United States Department of Health and Human Services.  States participating in the Medicaid program

created various state Medicaid programs which reimbursed healthcare practitioners, healthcare facilities and nursing homes for rendering Medicaid-covered services to Medicaid beneficiaries.

31.     The Medicare ("Medicare") program was created in 1965 as part of the Social Security Act, *42 U.S.C. §§ 1395 et seq.,* to provide a federally funded health insurance program for the aged and disabled. The United States, through the Department of Health and Human Services ("HHS"), administers the program, and has delegated the administration of the Medicare Program to the CMS ("CMS"), a component of HHS. Another component of HHS, the Office of Inspector General ("OIG"), is responsible for investigating Medicare fraud and abuse, as well as issuing regulations and instructions that implement the Medicare and Medicaid fraud and abuse authorities.

32.     The  Medicare program consists of two basic parts - Part A (*42 U.S.C. §§ 1395c - 1395i-5*) and Part B (*42 U.S.C. §§ 1395j - 1395w-4*). Part A covers all inpatient hospital services provided to eligible persons, known as Medicare beneficiaries. In addition, Part A covers certain home health services provided to Medicare beneficiaries who do not have Part B coverage. Part B provides coverage for a wide range of outpatient services, for physician and diagnostic services, for home health services for Part B eligible persons, and for durable medical equipment.

33.     Medicare makes payments under Part A and Part B using private companies and insurance companies ("contractors") which provide these services under a contract with HCFA. These companies pay Medicare claims and determine the amount of reimbursable costs based on coverage and reimbursement policies established by HCFA. The companies are also responsible for identifying fraud and abuse under guidelines established by the OIG.

34.     The Medicaid program and Medicare programs are collectively referred to as "Government Healthcare Programs"

## SPECIFIC ALLEGATIONS RELATED TO DELIGHT CARE AND MARINA SONTF'S CONDUCT IN NEW JERSEY

35.     In July 2009, Defendant Marina Sontf served as the program coordinator for Delight Care, pursuant to N.J.A.C. §13:37-14.2, and as such, she was responsible for the training program curriculum.  Delight Care served as the program sponsor, as defined in N.J.A.C. §13:37-14.2, since it was granted approval by the Board of Nursing to conduct a homemaker-home health aide training program.

36.     In New Jersey, pursuant to N.J.A.C. §13:37-14.4(b), a homemaker-home health aide program must consist of at least 76 hours. This 76 hours includes 60 hours of classroom instruction and 16 hours of clinical instruction in a skills laboratory or patient care setting.

37.     In New Jersey, pursuant to N.J.A.C. §13:37-14.4(c), this 16 hours of clinical instruction in a skills laboratory or patient care setting shall be supervised by a registered professional nurse.

38.     In New Jersey, the curriculum for a homemaker-home health aide training program shall include instruction in a wide range of topics, pursuant to N.J.A.C. §13:37-14.4(d)(1)-(15).  The topics include, but are not limited to: Foundations for Working with People, Safety, Conditions, Fire, Standard Precautions for Infection Control, Body Mechanics, Emergencies, Musculoskeletal, Integumentary System, Gastrointestinal System (Upper and Lower), Urinary System, Cardiovascular and Respiratory Systems, Neurological System, Endocrine System, Reproductive System, Immune System, Rest and Sleep, and Death and Dying.

39.     In New Jersey, pursuant to <u>N.J.A.C.</u> §13:37- 14.6 (a), the program sponsor shall provide an appropriately equipped classroom and skills laboratory with sufficient equipment and resources to provide for efficient and effective theoretical and clinical learning experiences.

40.     In New Jersey, pursuant to <u>N.J.A.C.</u> §13:37-14.8 (1)-(3), a program instructor's responsibilities include, but are not limited to,  developing a lesson plan for each content area, developing and implementing criteria for evaluating the classroom and clinical performance of each student, and developing and implementing criteria to determine whether a student has satisfactorily completed the training program.

41.     In July 2009, the Relator sought to obtain her home health aide license and registered for a training program at Delight Care. The Relator was one of about twelve students enrolled in the program. Approximately four other students spoke English as a first language, and one student spoke no English. The program was taught entirely in English.

42.     Immediately, the Relator began to realize that the class was merely a "sham" and provided very little, if any instruction.

43.     Although the aide program was supposed to include 60 hours of classroom instruction and 16 hours of clinical instruction in a skills laboratory or patient care setting, the Ms. Sontf only ran classes for approximately an hour and a half each day over the course of two weeks.  Ms. Sontf was frequently late to these sessions, and was often seen by students checking email and making phone calls.

44.     The course took place in a small office with only chairs and no desks provided; therefore the students would spend a portion of class time rearranging the room.  Upon information and belief, the classroom was not appropriately equipped as a learning environment and the students never entered a skills laboratory.

45. A routine of extended classroom breaks and early dismissals lasted for the duration of the two week period. The Relator estimates that the eight training sessions lasted no longer than 12 to 15 hours, although 60 classroom hours are required in New Jersey.

46. In addition, there was no clinical skills training, although 16 hours were required.

47. Delight Care's training program did not provide clinical instruction to its students. Those enrolled in the program were provided no books or handout materials for the duration of the program. When students would ask about acquiring text related to the program the instructor would frequently assure the students that it would be unnecessary and the class sessions were never geared toward preparing for the required Competency Examination, N.J.A.C §13:37-14.11.

48. Ms. Marina Sontf told the students that she would "help them" with the test. This violated N.J.A.C. §13:37-14.8, which required Sontf to develop and implement criteria to determine whether a student had satisfactorily completed the training program.

49. After the two weeks of "instruction" the students took the entire Competency Examination while communicating with fellow classmates. Students would frequently ask other individuals what they believed the answers were for each question. The students who did not speak English, were provided the answers by one student who translated for them. After the students collaborated on the test, Sontf then returned and provided the answers to any questions they did not understand. Upon information and belief, each student received a 100% completion.

50. At all times, Ms. Sontf advised the students that this was how they "always did it" and that all of her students always passed the test. Therefore, Sontf systematically and continually violated her responsibilities under N.J.A.C. §13:37-14.8, which required her to develop a lesson plan for each content area prior to the starting date of her program. She was also

required to develop and implement criteria for evaluating the classroom and clinical performance of the students.

51.     Following the test completion, the students were virtually guaranteed employment opportunities with Delight Care Home Health Agency or Visiting Nurse Association of Central New Jersey by Sontf and the Relator was given her first assignment before she actually received her license. These assignments were delegated by Sontf with full knowledge that the students were taught about very few of the topics required by New Jersey in a training program.

52.     The Relator accepted the offer of Ms. Sontf and began employment at Delight Care.

53.     In New Jersey, pursuant to N.J.A.C. §10:60-1.8:

(d) Homemaker-home health aide and personal care assistant services shall be
provided by the agency in accordance with the plan of care.
1. The aide shall arrive and leave each day as scheduled by the agency.
2. The same aide shall be assigned on a regular basis, with the intent of assuring
continuity of care for the beneficiary, unless there are unusual documented
circumstances, such as a difficult beneficiary/caregiver relationship, difficult location,
or personal reasons of aide or beneficiary/caregiver.
3. Services shall be within the scope of practice of personnel assigned.
4. Appropriate training and orientation shall be provided by licensed personnel to
assure the delivery of required services.
5. The aide shall provide appropriate services as reflected in the plan of care and
identified on the assignment sheet;

54.     In New Jersey, pursuant to N.J.A.C. §13:37-14.2-3, a home health aide should be supervised by registered professional nurse.

55.     The Relator was never provided care plans and received no supervision from registered nurses at Delight. Upon information and belief, Delight Care provided little to no supervision to those aides who had been trained through its program in violation of N.J.A.C. §13:37-14.2-3.

56.     Ms. Sontf, used her Delight Care Home Health School to systematically and fraudulently license aides in order to staff her own organization with unlawfully licensed and unqualified aides who could help her defraud Medicare and Medicaid.

57.     Since Ms. Karume is now a nurse, she can state emphatically that she received virtually no medical training whatsoever from the home health aide program.   The whole goal was to spend a few days getting used to the culture and then to get a job, as opposed to learning the duties of a home health aide, as set forth in N.J.A.C. 13:37-14.3. The curriculum set forth in N.J.A.C. 13:37-14.4(d) was implemented in New Jersey to ensure that home health aides would be adequately prepared to deal with issues they would likely encounter on the job.

58.     Ms. Karume was informed at training that prior to meeting with clients a care plan should be provided, detailing important patient information and how to provide care to each specific patient. In accordance with N.J.A.C. 10:60-1.2  DDS and DMAHS mandate that LCA provide services **under the supervision of a registered professional nurse as certified by a physician in accordance with the written plan of care**. N.J.A.C. 10:60-1.2

59.     On or about July 6th or 7th 2009, Ms. Karume got her first assignment for a patient located in New Brunswick in a low income housing area.  When she arrived, Ms. Karume observed that the patient was able to perform many things for himself.  He was driving, and required no services.

60.      However, he did ask Diana to give him an insulin shot which she refused, in accordance with N.J.A.C. 13:37-14.3(b) (Duties of a homemaker- home health aide; supervision).  Ms. Karume advised Ms. Sontf that the patient did not need home health services. Ms. Sontf removed Ms. Karume from the case.

61.     Ms. Karume's  next assignment was in Highland Park.  The patient was terminally ill and received services from multiple aides.  However, prior to going to see the patient, Ms. Karume was not oriented by nurses to the patient or a care plan.  In fact, she knew nothing about the care plan at that time.  She was assigned to this patient for approximately 2 weeks. During

that time period, she sat in the kitchen with the patient's wife and talked for hours and provided no services.

62.     She reported this to Ms. Sontf who told her to continue to go see the patient even though she was not providing any PCA services.   In fact, Ms. Sontf explained that Ms. Karume should fill out her time sheet to indicate that actual services were being provided because that was how the company made money.

63.      Ms. Karume recalls being called into the offices on several occasions and being asked to sign many forms at Delight Care Home Health Agency.

64.     She believes, in hindsight, that she was signing her time sheet which indicated that she was in fact following a care plan, even though she was not.

65.     In addition, she believes that she may have also been signing nurse supervisory forms because during her entire time with Delight Care Home Health Agency, she never had a nurse supervise her.

66.     Eventually, Diana Karume asked not to be sent back to the patient because the only "service" she was performing was sitting and keeping his wife company.  Although she felt bad for the patient, she realized that this was an inappropriate use of services.

67.     Following this assignment, Diana did not return to Delight Care Home Health Agency for any further services.

68.     Upon information and belief, Delight Care Home Health Agency submitted bills for these services.

69.     Upon information and belief, Ms. Karume's experience was not atypical and she believes the entire culture of the agency was to bill Medicaid for inappropriate services that were rendered by aides who were unlawfully trained and licensed.

## SPECIFIC ALLEGATIONS RELATED TO RMCC, JONATHAN ROSEBERG, ESTHER ROSENBERG, TIGI KANU, AXA KIEFFER, MAGGY LAWRENCE, WILFREDA KANU AND DR. VALLUR S. THIRUMAVALAVAN'S CONDUCT IN NEW JERSEY

### A.     UPCODING OF PATIENT CONDITIONS AND TREATMENTS

70.     Pursuant to 42 CFR 483.20, *et seq*, N.J.A.C. §8:85-2.1 and 2.2, RMCC is required to evaluate all patients upon admission and throughout their stay at the facility.

71.     These assessments are required to be performed within 14 days of the patient's

admission and every year thereafter pursuant to 42 CFR 483.20(b)-(c),  N.J.A.C. §8:85-2.2(c)(1)(i).  In addition, a new assessment must occur within 14 days of a significant change in the status of a patient, as set forth in 42 CFR 483.20(b)-(c) and N.J.A.C. §8:85-2.2(c)(1)(i) .

72.     These evaluations are required to ensure proper evaluation, treatment, and diagnosis of the patients.

73.     The Minimum Data Set ("MDS") Assessment, as defined in N.J.A.C. § 8:85-1.2, is required by 42 CFR 483.20 and is used to screen and evaluate the health of patients in long-term care facilities for Medicaid and Medicare services. The MDS assessment is a critical tool, used to judge each resident's capabilities and health in order to assist in providing adequate care.

74.      The MDS tool, when appropriately followed, helps nursing homes thoroughly evaluate residents and provide each resident with a standardized, comprehensive and complete assessment.

75.     There is a direct correlation between the MDS assessment score and Medicare and Medicaid reimbursements.  That is, the greater the disabilities or functional limitations of the patient as identified on the MDS, the greater the reimbursement to the facility. Federal and state law requires that these forms be signed by the persons completing the assessment.

76.     Medicaid, like Medicare, pays for patient care based upon patient diagnosis, need for treatment, and need for care and assistance.

77.      At RMCC, as in almost all nursing homes, certified nursing assistants ("CNAs") complete what is known as an ADL ("Activities of Daily Living") log.

78.     These ADL codes determine whether a patient's status is: Independent (Code: "0"); Supervision (Code: "1"); Receives limited assistance (Code "2"); Receives extensive assistance (Code "3"); has total dependence (Code "4"); or the activity did not occur (Code "8").

79.     In general, the ADL coding rules require that the resident be coded at the most dependent level of care that occurred three or more times in the observation period as reported by the patient's CNA. In its simplest terms, the greater the dependency code indicated by the CNAs on the ADL logs, the greater the dependency code in the MDS and therefore the greater the reimbursement.

80.     Defendants Tigi Kanu, Maggy Lawrence, Wilfreda Kanu and other high ranking officials at RMCC routinely instructed nurses and CNAs to unlawfully alter the medical records regarding patient care to make it appear that either, (1) patients require more care than they actually need; or (2) that they can benefit from additional care when they are too ill to receive any such benefit.   Such alterations are in violation of 42 C.F.R. §483.20, which requires a facility to conduct initial and periodic comprehensive, accurate, standardized, and reproducible assessments of each resident's functional capacity.

81.     At RMCC, as per the supervisor's instructions, on the specified dates, certain patients' charts were pulled and the nurses who were assigned to care for the patients were instructed to add false entries in the charts to support the inflated MDS assessments.

82.     At RMCC, as a matter of practice, these nurses would pull the patients' ADL logs which were previously fabricated by the RMCC CNAs.  Nurses would then chart issues such as bed mobility, transfer, washing/dressing, eating, toileting, behavior and ambulation. The scheme was to make the charts consistent with that which was recorded in the ADLs by the CNAs. Specifically, the RMCC nurses would record limitations and dependencies whether or not the patient had in fact exhibited those dependencies or limitations.

83.     RMCC CNA's have been trained and instructed to fabricate the Activities of Daily Living log after every shift change.

84.     RMCC Nurses have also been trained to fabricate patient charts to match the unlawful fabrications set forth by CNAs in the ADL logs.

85.     Following the fabricated ADL's and nurses charts, RMCC's MDS coordinator will utilize this false data to then overstate RMCC's functional disabilities in order to increase Medicaid reimbursements.

86.     Upon information and belief, this falsification of documents and up-coding of MDS assessments required care occurs with nearly all patients of RMCC.

87.     In order to ensure that the inflated MDS scores are consistent with the patient records, RMCC has established a systematic charting scheme, where each of the patients has a fraudulent entry placed in his or her chart at regular intervals.

88.     In fact, a charting scheme schedule is published each week by senior management and all nurses are required to follow the scheduled plan. Senior management monitors whether the nurses are complying with the unlawful scheme. Senior management reprimands Nurses when they fail to carry out all of the false charting in accordance with the posted schedule.

89.     In accordance with the published schedule, false charting which would support inflated MDS assessments should be seen in a patients' chart every two weeks and will follow sequentially from Room 1 through Room 32 on the West Wing.

90.     This fabrication scheme has occurred since the Relator began her employment at RMCC.

91.     The East Wing charting is completed by a single CNA, Christina Rowland.

92.     Jeneba John is another CNA who would chart the ADL's when Christina Rowland is not available or does not complete the task.

93.     There is no government healthcare program requirement that this type of MDS

charting occur on any regular.  The only time a nursing home should document these behaviors is when a nurse actually observes one of these behaviors. Upon information and belief, the sole reason for nurse charting in this fashion is to falsely support the fraudulent ADLs logs.

.

## B.    FALSIFIED DOCUMENTATION

94.    As described above, Defendants have a routine practice of falsifying documents to increase Medicare and Medicaid funding to the facilities.  Falsification of documents is in clear violation of Medicare and Medicaid regulations, as discussed above, that require accurate, reproducible documentation.

95.    The types of falsifications at RMCC include, but are not limited to, the falsifications of medical and nursing records, and backdating of records. Often times, the treatment ordered is completely unnecessary and all treatments are ordered by nurses.

96.    For example, Defendant Nurses have written physician orders, and ordered treatments for patients as if they were the patient's treating physician. Such falsifications have occurred on the charts of patients JJ, KK, and LL, among others.

97.    Furthermore, a series of patients, including AR, AS, AN, AP, RR, AQ,  II, BB, and AT, have had their documents falsified to reflect the administration of breathing treatments that were never rendered.

98.    RMCC will frequently chart patients for skilled nursing and physical therapy even though they rarely receive these treatments. This is especially prevalent in the sick and elderly. Defendants Nurses have written physician orders for physical therapy and skilled nursing on patient's charts that are so physically disabled and/or contracted as to not be able to have this therapy performed.  These patients include, but are not limited to BB, CC, DD, and EE.

99.     Defendants have unlawfully falsified documents to reflect patients are receiving skilled nursing on a regular basis even though they have been too healthy or refused skilled rehabilitation. These patients include, but are not limited to, FF, GG, and HH. These patients' charts reflect that they engage in these activities on a regular basis.

100.    Defendant Nurses have written physician orders on patient charts who are fully ambulatory, who require no or minimal assistance in activities of dialing living, including patient II.

101.    Pursuant to 42 C.F.R. §483.35, government healthcare programs require that nursing homes provide nutrition suitable to meet the nutritional needs of their patients.  Part of the requirement of providing care to wound patients, and others is the provision of dietary services. Defendant Nurses and CNA's up-code patient care by certifying that dietary services are offered when they, in fact, are not.

102.    Upon information and belief, medical records contain documentation that this care is provided for patients when it frequently is not. For example, many wound patients are not given any special diet to assist in their wound healing. Patient MM had a wound so severe that her bones was visible, yet she was provided no special diet and ended up passing away from Sepsis.

103.    Indeed, many of these patients, who are also diabetic, are receiving traditional diets and regular calorie and carbohydrate food. In most instances, these patients are receiving snacks, such as ice cream, and peanut butter and jelly sandwiches. These sandwiches are provided with nearly every meal and ice cream is served after ever meal as well.

104.    Diabetic patients who are regularly fed peanut butter and jelly sandwiches, regardless of their medical conditions which require a special diet, include but are not limited to,

II, FF, OO, and NN (who has since been discharged).

105.    Treatment records were and are altered to make patient conditions appear more serious than they actually are, thereby increasing the amounts of payments requested for particular patients. These actions are in violation of Medicare and Medicaid regulations requiring accurate assessments. See 42 C.F.R. §483.20; 42 C.F.R. §424 Subpart D. Patients whose conditions have been exaggerated include, but are not limited to, PP, KK, and FF.

106.    Many patients are documented to have behavioral care issues, which warrants increased Medicare and Medicaid funding whether they have such issues or not. These patients include, but are not limited to AA, RR, and HH.

107.    When doing admissions, senior management instructs that patients who are not admitted with wounds should have documents falsified to state that the patient has "reddening of the skin" to appear as if a wound may occur, just "incase." If there is a wound at the time of admission, employees are instructed to document the wound at a higher stage.

108.    Upon information and belief, these alterations of medical records occurred on many other patients of defendant RMCC; and occurred while Defendant Jonathan and Esther Rosenberg owned the facility.

109.    Patients who require hospice care are not being given such care, as a change in status from skilled nursing to hospice would decrease the Medicare and Medicaid funding received by Defendant RMCC. As a result, patients in need of hospice care do not receive hospice care.

110.    For example, patient, SS, was dying in the summer of 2011. Despite this fact, which was known to the patient and the staff, she did not receive hospice care. She was not fully conscious and her speech was limited. She was not adequately treated for pain and anxiety

relating to her impending death.

111.    These care decisions were made by senior management solely for the purpose of increasing revenue from Medicaid and Medicare When nurses would question Wilfreda Kanu and Axa Kieffer, about the possibility of contacting family or transferring to hospice they stated that it was unnecessary.

112.    The need of the patient for hospice care was deliberately disregarded to increase the funding received by Defendants.

113.    Falsification of documents frequently occurred on the physician orders of patients who receive medications for hypertensive conditions.

114.    All medications that are given for high blood pressure require that the patients' blood pressure be monitored before the drug is administered.

115.    These patients are ordered to receive twice daily medications, and to have their blood pressures monitored before each dose. RMCC does not have any adequate blood pressure monitoring device and only some nurses carry their personal devices.

116.    On a routine basis, patient monitoring does not occur. Patients on blood pressure medicine do not have their blood pressures taken before administration of medicines. This is a violation of the standard of care for the administration of these medications.

117.    Nurses are instructed to merely chart patient blood pressures consistently within a normal range of results.

118.    Defendant, RMCC, has also allowed the falsification of records related to patient social leaves of absence.  Pursuant to 42 C.F.R. §409.34, Medicare regulations do not permit patients to leave the facilities for social leave absences since care must be provided on a daily basis in order to qualify.

119.     Defendants are aware of Medicare and Medicaid rules prohibiting or limiting these social leave absences and despite this awareness, there has been fraudulent billing for absentee patients.

120.     Defendants have permitted the creation of falsified documents to conceal that government healthcare program recipients were taking social leaves of absence.

121.     For example, XX frequently travels out of the country to China and is absent for days, weeks, or months at a time.  Notwithstanding, he is always included in the census.  Also, nurses will chart on him for purposes of MDS assessments. Medication is presumably also delivered, which is not otherwise given to him.

122.     RMCC also provides fraudulent beneficiary services to residents who should not qualify for government healthcare programs.

123.     For example, patient AU's diagnosis includes hypertension and other fabricated diagnoses.  Notwithstanding the diagnosis in the chart, AU is completely independent.  He often left the facility on numerous occasions to attend to matters.  It is also believed that he has a girlfriend who is one of the translators in the East Wing. He maintains his room in an extremely clean manner and functions quite normally.

124.     Similarly, patient YY is believed to be receiving excessive skilled nursing and medical treatment, which is not completely medically necessary.  YY benefits from the fact that she is the mother of the patient recruiter for the facility.  As such, she is afforded special protection and is provided numerous unnecessary tests and medical treatments whenever she asks. She receives beneficial treatment that other patients are not afforded.

125.     Finally, although not verified, it is believed that the ambulance service that transports her for her weekly dialysis treatment also provides personal valet services for her to

attend dinners with her family at home.

### C.     FRAUDULENT BILLING FOR SERVICES NOT RENDERED AND MEDICINES NOT GIVEN

126.    RMCC has a systematic method of charting patients as if they are receiving treatment/medication three times daily. However, the patient will only receive treatment if he or she is actually in distress.

127.    This behavior frequently occurs with patients who require breathing treatment. Those patients include the following: AR, AS, AN, AP, RR, AQ, II, BB, and AT.

128.    Breathing treatment will only be given when it is actually needed and nurses are trained to chart as if it is occurring multiple times during the day. This is a cost saving measure since it is not possible for the limited nurses on duty to give this breathing treatment, required by up to six patients, and still complete all the other tasks. This is a significant amount of work for a nurse to undertake and RMCC has found it to be more efficient to only provide the treatment as necessary, yet chart as if it occurs routinely.

129.    Another way of fraudulently billing government healthcare programs in through physical therapy and skilled nursing. As previously noted, RMCC frequently documents that patients are receiving physical therapy when they are either too sick, too healthy, or have simply refused treatment.

130.    For example, patient AQ was discharged from a local hospital to RMCC around November of 2011.  At that time, part of her discharge plan was for her to receive skilled rehabilitation services.  Notwithstanding the discharge orders, AQ never received the skilled rehabilitation services. When the Relator advised senior management, including Tigi Kanu, that she was not getting the services, and she was told to continue to chart as if AQ was receiving the rehabilitation services. AQ was unable to leave her bed during this time period.

131.    Similarly, patient GG, and East Wing resident, refused to engage in the skilled services, such as physical therapy. Nonetheless, his chart was still falsified to reflect that he had been attending these sessions.

132.    FF, another East Wing resident, was also registered for skilled services that he never received. He would frequently hang out at the nursing station and converse with employees while he was supposed to be receiving therapy. Wilfreda Kanu told ordered the Relator to chart as if these services were in fact being rendered.

133.    Similar falsifications also occurred on the administration of general medications, including the backdating of medication administration records, to make it appear as if medications had been given as ordered when in fact they have not been given.

134.    Upon information and belief, some drugs are missing from the facility and employees will often take the patients' medication themselves. When medication is missing or consumed by someone other than the patient, employees chart that the medication was administered to the patient.

135.    Patients will often go without medication for extended periods of time because pharmacies will not send out additional prescriptions until a re-fill is due. Nevertheless, nurses will continue to chart that a patient is taking the medications and RMCC will seek reimbursement from Medicare for the medicine.

D.    **FRAUDULENT BILLING FOR AND ENCOUNTERS THAT DO NOT OCCUR BY DR. THIRUMAVALAVAN**

136.    Pursuant to 42 C.F.R Subchapter G § 483.40, a patient's physician is required to have an encounter with the patient every 30 days.

137.    Pursuant to 42 C.F.R. § 483.40, that encounter must occur while the doctor is actually in the presence of a patient.

138.    The Relator has provided 19 East Wing patients' records who have been assigned to Dr. Thirumavalavan. Upon information and belief, Dr. Thirumavalavan has other patients at RMCC equaling about the same number of patients in the West Wing.

139.    In February of 2012,  Dr. Thirumavalavan came in to "see" his patients. As has been common practice during the Relator's tenure at RMCC, Ms. Mathew handed her a list of patients that Dr. Thirumavalavan needed to see and was told to go check on those patients and record their vital signs. To the best of the Relator's recollection, those patients were II, AD, and one other patient.

140.    The purpose for recording the vitals was so that Dr. Thirumavalavan could chart on these patients without actually encountering them.

141.    At the instruction of her supervisor, the Relator recorded the vital signs and turned them back in to either a charge nurse or the nurse at the desk on a separate piece of paper.

142.     In addition, the other nurses working in the East Wing on that date were also asked to engage in similar conduct and turn in the vital signs of their patients for Dr. Thirumavalavan.

143.    Dr. Thirumavalavan was provided the charts and information, and in full view of Ms. Karume and other nurses, he began charting on these patients and writing out consultation notes. Dr. Thirumavalavan arrived at RMCC at approximately 10 a.m. and stayed less than one 1 hour charting on the patients in the East Wing. Shortly thereafter, he went to RMCC's West Wing and presumably engaged in the same conduct.

144.    A short time later, the Relator saw Dr. Thirumavalavan in the West Wing break room with charts engaging in the same activity.

145.    At no point in time, on this date, did the Relator ever see Dr. Thirumavalavan

actually go into a patient's room.

146.     The conduct outlined above has been Dr. Thirumavalavan's practice during the entire time that Diana Karume has been a nurse at RMCC.

**COUNT I**
**(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(A))**

147.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

148.     Upon information and belief, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for services that were either not performed or were not eligible for reimbursement for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

149.     Said false and fraudulent claims were presented with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

150.     The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid Defendants for these false and fraudulent claims had it known the falsity of the said claims by Defendants.

151.     As a direct and proximate result of the false and fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

WHEREFORE, Relator, Diana Karume respectfully requests this Court to award lawful damages and attorney's fees and cost in accordance with the law.

**COUNT II**

**(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(B))**

152.    Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

153.    These Defendants knowingly made, used, and/or caused to be made and used false documents to certify that they provide adequate care, sufficient to maintain and/or improve the quality of life of their Medicare and Medicaid patients. These documents were false because they (1) up-coded the level of care required for patients; (2) contained falsifications; or (3) contained certifications of standards of care which were in reality substandard.

154.    On information and belief, defendants knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

155.    Defendants' knowingly used false records or false statements were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the United States for reimbursements and benefits.

156.    Defendants' materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment for services when in fact they were ineligible or billed for ineligible services.

157.    These said false records or false statements were made, used or caused to be made or used, with defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

158.    As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by defendants, the United States has

suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

WHEREFORE, Relator, Diana Karume respectfully requests this Court award lawful damages and attorney's fees and cost in accordance with the law.

## COUNT III
## (VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT -- N.J.S.A. § 2A:32C-3(a))

159.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

160.     Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the State of New Jersey in violation of N.J.S.A. § 2A:32C-3(a).

161.     Said false and fraudulent claims were presented with defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

162.     The State of New Jersey relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid defendants for these false and fraudulent claims had it known the falsity of the said claims by defendants.

163.     By virtue of the false or fraudulent claims, the State of New Jersey suffered damages and therefore is entitled to recover from Defendant treble damages under the New Jersey False Claims Act, in an amount to be proved at trial, plus a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act.

WHEREFORE, Relator, Diana Karume respectfully requests this Court award lawful damages and attorney's fees and cost in accordance with the law.

<u>COUNT IV</u>
<u>(VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT -- N.J.S.A. § 2A:32C-3(b))</u>

164.    Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

165.    These Defendants knowingly made, used, and/or caused to be made and used false documents to certify that they provide adequate care, sufficient to maintain and/or improve the quality of life of their Medicare and Medicaid patients. These documents were false because they (1) up-coded the level of care required for patients; (2) contained falsifications; or (3) contained certifications of standards of care which were in reality substandard.

166.    On information and belief, defendants knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the State of New Jersey, in violation of N.J.S.A. § 2A:32C-3(b).

167.    Defendants' knowingly false records or false statements were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the State of New Jersey for Medicaid reimbursements and benefits.

168.    Defendants' materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment for services that were not necessary or needed.

169.    These said false records or false statements were made, used or caused to be made or used, with defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

170.    As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by defendants, the State of New

Jersey has suffered damages and therefore is entitled to recovery as provided by the New Jersey False Claims Act in an amount to be determined at trial, plus a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act.

WHEREFORE, Relator, Diana Karume respectfully requests this Court award lawful damages and attorney's fees and cost in accordance with the law.

**MININNO LAW OFFICE**
Attorney for the Plaintiff/Relator

_____
John R. Mininno, Esquire (JRM 7223)

Dated:

## **JURY DEMAND**

Pursuant to Rule 38, Plaintiff demands a trial by jury on all Counts.

**MININNO LAW OFFICE**
Attorney for the Plaintiff/Relator

_____
John R. Mininno, Esquire (JRM 7223)

Dated: